# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche Manning | Sitting Judge if Other than Assigned Judge | Nan R. Nolan |
|---|---|---|---|
| **CASE NUMBER** | 02 C 9151 | **DATE** | 3/5/2003 |
| **CASE TITLE** | Heritage Env Svc Inc vs. Metro Water Reclamation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Report and Recommendation that Heritage's motion for a preliminary injunction be denied. In addition, Heritage's motion in limine to exclude extrinsic evidence [13-1] and the District's motion for a directed finding [19-1] should also be denied is hereby submitted to Judge Manning. All matters relating to the referral of this action having been resolved, the case is returned to the assigned judge.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | 3 number of notices | **Document Number** |
| | No notices required. | | |
| ✓ | Notices mailed by judge's staff. | MAR 06 2003 date docketed | 27 |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| ✓ | Copy to judge/magistrate judge. | 3/5/2003 date mailed notice | |
| cav courtroom deputy's initials | | 03 MAR -5 PM 4:58 Date/time received in central Clerk's Office cav mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



DOCKETED
MAR 0 6 2003

| | |
|---|---|
| HERITAGE ENVIRONMENTAL SERVICES, INC., an Indiana corporation, ) ) ) Plaintiff, ) ) vs. ) METROPOLITAN WATER RECLAMATION ) DISTRICT OF GREATER CHICAGO, an ) Illinois municipal corporation, ) ) Defendant. ) | Case No. 02 C 9151 |

## REPORT AND RECOMMENDATION

NAN R. NOLAN, Magistrate Judge:

Plaintiff Heritage Environmental Services, Inc. ("Heritage") seeks a mandatory preliminary injunction requiring defendant Metropolitan Water Reclamation District of Greater Chicago (the "District") to sign a permit allowing Heritage to continue performing certain hazardous waste removal services on District-owned property. The motion was referred to this Court for an evidentiary hearing and a Report and Recommendation as to whether the motion should be granted. In making its recommendation on this matter, the Court has considered the facts and documents set forth in the complaint and the parties' briefs and submissions, as well as the witness testimony and exhibits presented at a hearing on February 7 and continued on February 11, 2003. For the reasons set forth below, the Court recommends that Heritage's motion for a preliminary injunction be denied.

27

## FACTUAL BACKGROUND

The District is a statutorily created municipal corporation charged with protecting the waters of Lake Michigan and the inland waterways by collecting, treating and disposing of sewage. 70 ILCS 2605 *et seq*. It is administered by a board of nine Commissioners elected at large from the area served. The Board appoints a General Superintendent who serves as the District's chief administrative officer responsible for all administrative and operational matters. 70 ILCS 2606/4; Tr. 410. By statute, the District may acquire real property for the purpose of carrying out its governmental function. When appropriate, the District may lease the property to third parties. 70 ILCS 2605/8.

On March 16, 1961, the District entered into an agreement with Lemont Industrial District, Inc. ("LID") to lease approximately 68.16 acres of District property for a term of 99 years. Cmplt. ¶8 and Ex. A. On May 1, 1980, LID subleased approximately 17.2 acres located at 15330 Canal Bank Road, Lemont, Illinois, to a company called PetroChem. PetroChem was engaged in several lines of business, including cleaning and storage of oily waste and hazardous waste fuels. Tr. 46. Pursuant to the lease agreement, LID was not required to obtain the District's approval prior to executing the sublease. In the early- to mid-1980s, Heritage purchased 50 percent of PetroChem's assets. Heritage is a privately-held Indiana corporation that operates 21 hazardous and non-hazardous waste treatment and storage facilities throughout the country. Tr. 45. Heritage and PetroChem made improvements to the property, including constructing an aerosol can crushing unit. Then in 1988, Heritage purchased all of PetroChem's assets and applied for a permit to operate a hazardous waste treatment, storage and disposal facility at the Lemont site.

The United States Environmental Protection Agency ("USEPA") has issued detailed regulations governing the operation of a hazardous waste treatment, storage and disposal facility, known as the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §6901 *et seq*. The USEPA authorizes Illinois to carry out the federal RCRA program through the Illinois Environmental Protection Agency ("IEPA"), and it is the IEPA which decides whether to issue RCRA permits to hazardous waste facilities in Illinois. The application for a RCRA permit consists of two parts: Part A identifies the facility, owners and operators; Part B details the operation and sets forth the conditions of operation. Heritage submitted Part A of its application in 1988 and, as a new site applicant, was granted permission to operate the Lemont facility under "interim status" until a full permit was either issued or denied. Tr. 55.

In or about 1992, the IEPA directed Heritage to submit Part B of its RCRA permit application – a very cumbersome disclosure requiring repeated modifications and additions and which can take four or five years to complete. At that time, Heritage made its first contact with the District because the company needed the District to sign its permit application as the owner of the land where the hazardous waste treatment facility was located. After extensive negotiations, the District ultimately agreed that LID would assign its lease to Heritage with certain amendments. On December 4, 1992, the parties entered into a Partial Assignment and Assumption of Lease (the "Assignment"), maintaining the lease term running until March 31, 2060. The Assignment included broad indemnification and insurance provisions, increased the rental amount, and added the following section regarding the RCRA permit:

> 10.04 (Permit Applications). The lessor agrees to execute Lessee's permit application for a RCRA Part B permit concurrent with the parties' execution of this Agreement. During the initial term of said permit, the Lessor agrees to

> cooperate with Lessee in the execution of any additional documentation necessary to effectuate Lessee's compliance with changing regulatory requirements and/or proposed operational or structural changes to Lessee's Lemont facility where such changes are approved by the USEPA and/or IEPA, such cooperation shall not be unreasonably withheld. Subsequent to the initial permit term, Lessee may request the Lessor's legal and technical staffs to submit a recommendation to Lessor's Board of Commissioners, said recommendation not to be unreasonably withheld, seeking the approval for the execution of documents necessary for any subsequent permit renewal or extension.

Jt. Ex. 2, §10.04. Pursuant to §10.04, the District signed Heritage's RCRA permit application on December 5, 1992. On March 24, 1993, the IEPA issued a RCRA permit jointly to Heritage and the District as co-permittees, effective April 28, 1993. PX 1; Cmplt. ¶10.

In May 2000, Heritage petitioned the Illinois Pollution Control Board for an adjustment to the RCRA certification language to be signed by the District as landowner. The District was not a party to the proceedings before the Pollution Control Board but was aware of Heritage's activities in that regard. Tr. 370-71. On February 1, 2001, the Pollution Control Board issued an Order allowing the adjustment. The revised certification allows the District to rely on Heritage's confirmation that it is in compliance with all environmental laws and regulations, as opposed to directly confirming such compliance by personal inspection. PX 14.

In June 2002, Heritage contacted the District about executing a renewal application for the RCRA permit which was set by regulation to expire on April 28, 2003. On July 23, 2002, Heritage sent two copies of its Renewal Application to the District for its review. The parties periodically corresponded about the renewal throughout the summer and then met in person in October 2002. On October 18, 2002, Heritage filed its RCRA permit renewal application with the IEPA without the District's signed certification. PX 18. On October 29, 2002, the District's General Superintendent, John Farnan, asked Mark Leibrock of the District's Site Remediation

Section ("SRS") to inspect Heritage's Lemont facility and issue a recommendation regarding the permit renewal application. DX 19A; Tr. 428-29. Leibrock sent Superintendent Farnan a memo on November 15, 2002 agreeing with the District's Law Department that renewal would expose the District to essentially unlimited liability and was, thus, not recommended. PX 19; DX 19.

On December 12, 2002, the District's Principal Assistant Attorney, Carlton Lowe, notified Heritage's counsel that the District would not execute the renewal application. PX 2; DX 21. In a December 10, 2002 Board Transmittal Letter drafted for Superintendent Farnan's approval, Lowe stated:

> [t]he question presented by the Heritage request is essentially the same as was presented approximately ten years ago when the initial permit was executed. In its simplest form, the question is whether a governmental entity should agree to be a co-permitee to a private hazardous waste treatment facility with its potential attendant liabilities.

Lowe explained that notwithstanding the modified certification language, regulatory agencies could still attempt to hold the District liable for any violation by Heritage. PX 2; DX 22; Tr. 441.

On December 17, 2002, Heritage filed a Verified Complaint for Injunctive and Other Relief and an Emergency Motion for Temporary Restraining Order to require the District to sign the RCRA permit renewal application prior to the submission deadline of December 20, 2002. Two days later, the IEPA advised Heritage that the agency would allow Heritage additional time to cure the certification deficiency and the motion for TRO was converted to one for preliminary injunction. *See* Order of 12/19/02. The IEPA has now given Heritage until April 28, 2003 to submit a fully signed permit renewal application. If the complete application is not submitted by April 28, 2003, the RCRA permit will expire and Heritage will no longer be able to perform any RCRA-permitted operations at its Lemont facility. Tr. 202-03, 205.

## DISCUSSION

A plaintiff seeking a preliminary injunction must show: (1) a reasonable likelihood of success on the merits; and (2) that it has no adequate remedy at law and will suffer irreparable harm if the preliminary injunction is not granted. *Promatek Industries, Ltd. v. Equitrac Corp.*, 300 F.3d 808, (7th Cir. 2002) (citing *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)). If the plaintiff satisfies these conditions, the Court must then consider (3) the irreparable harm the nonmoving party will suffer if preliminary relief is not granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to non-parties. *Abbott Laboratories v. Mead Johnson Co.*, 971 F.2d 6, 11-12 (7th Cir. 1992); *Jones v. InfoCure Corp.*, 310 F.3d 529, 534 (7th Cir. 2002). The Court then weighs all four factors seeking to "minimize the costs of being mistaken." *Abbott Laboratories*, 971 F.2d at 12.

### A.   Likelihood of Success

To demonstrate a likelihood of success on the merits of its claim for breach of contract, Heritage must show (1) the existence of a valid contract; (2) performance by Heritage; (3) breach by the District; and (4) resultant injury to Heritage. *Gonzalzles v. American Express Credit Corp.*, 315 Ill. App. 3d 199, 206, 733 N.E.2d 345, 351 (2000). In analyzing the District's obligations under the Assignment, the Court must first determine whether the contract language is intrinsically or extrinsically ambiguous. Intrinsic ambiguity exists when the contract's terms are internally unclear; extrinsic ambiguity exists when "a perfectly clear agreement is unclear when applied to the real-world context of the deal." *Interim Health Care of Northern Illinois, Inc. v. Interim Health Care, Inc.*, 225 F.3d 876, 879 (7th Cir. 2000). Ambiguity can be found

6

only if the contract language is "reasonably or fairly susceptible of more than one construction." *Id.* (quoting *A.A. Conte, Inc. v. Campbell-Lowrie-Lautermilch Corp.*, 132 Ill. App. 3d 325, 328, 477 N.E.2d 30 (1985)). If the court determines that a contract is ambiguous, it may turn to extrinsic evidence to determine the intent of the parties. *Houben v. Telular Corp.*, 231 F.3d 1066, 1072 (7th Cir. 2000); *C.A.M. Affiliates, Inc. v. First American Title Insurance Co.*, 306 Ill. App. 3d 1015, 715 N.E.2d 778, 782 (1999).

In this case, §10.04 of the contract provides that "[s]ubsequent to the initial permit term," the District's legal and technical staffs are not to "unreasonably withh[o]ld" a recommendation to the Board to renew the RCRA permit for another ten years. The contract also contemplates that Heritage has complete discretion whether to seek a permit renewal in the first place. Both parties argue that this language is clear on its face, but this Court finds that the contract is ambiguous as to the circumstances under which the District's staff members may recommend against renewing the RCRA permit. The contract does not specifically identify grounds which may be considered reasonable or unreasonable in this regard, and the parties needed a full hearing and several rounds of briefing to explain their competing interpretations. As this dispute indicates, the term "unreasonably" is susceptible of more than one construction, particularly in light of Heritage's discretion in seeking permit renewal. For example, it could require the District to demonstrate that during the initial permit term, circumstances changed such that the District is justified in withholding the recommendation. Or it could merely require the District to articulate some rational basis for its current decision without regard to the initial permit term. In this regard, the Court also notes that the contract fails to explain what constitutes the "initial permit term" or any "subsequent" time period.

7

Having found that the contract is ambiguous, the Court next considers available extrinsic evidence to determine the parties' intent. From July 1990 to April 1996, Victoria Kincke served as Heritage's Vice President of Legal Affairs. In that position, she was primarily responsible for negotiating the Assignment between Heritage and the District in 1992. Tr. 167-69. Kincke testified that she understood §10.04 to mean that the District's legal and technical staffs "were required to recommend to the Board that they execute the permit." Inconsistently, Kincke also testified that Heritage insisted on a reasonableness standard which required the staffs to act reasonably in deciding whether to make the supposedly mandatory recommendation. Tr. 181, 194. But why would Heritage need or even want a reasonableness provision if the staff members were *required* to recommend executing the permit renewal application?

Carlton Lowe was primarily responsible for negotiating the Assignment on behalf of the District. Tr. 265, 319. Lowe testified that the District first became aware of Heritage's RCRA permit application in or about May 1992 when the company asked the District to sign the application as owner of the land. DX 2; Tr. 270, 318-20. Lowe was assigned to investigate the request to learn more about Heritage and the potential ramifications of becoming a co-permittee with a hazardous waste treatment facility. Tr. 320-23. By letter dated August 10, 1992, the District notified Heritage that it declined to execute the permit application due to concerns about being jointly and severally liable for environmental violations occurring at the facility. DX 4; Tr. 324-27. In response, Heritage requested a meeting with the District to discuss the issue further. At the meeting, Heritage appealed to the District to reconsider its decision, explaining that the company had invested substantial sums (later estimated at around $6 million dollars) in

8

anticipation of obtaining the permit. After receiving considerable pressure from Heritage, the District agreed to reconsider the matter. Tr. 327-28, 336.

Over the next few months, Kincke "would essentially camp out in the District's conference room," with or without an appointment, to try and get a few minutes of Lowe's time. Tr. 185-86, 329. On September 1, 1992, she sent Lowe a letter setting forth Heritage's proposal for minimizing the District's liability risks, including indemnification and insurance provisions. Kincke suggested bringing LID into the discussions and also proposed that the District conduct a sale of the property during the initial permit term, which at that time Kincke defined as five years. DX 5; Tr. 329-32. Based on Heritage's verbal commitment to address some remaining concerns, Lowe prepared a Board Transmittal Letter dated October 1, 1992 requesting that the General Superintendent recommend that the Board execute the RCRA permit application and allow Heritage to take over LID's lease. DX 6; Tr. 337-39. The letter was presented at the Board's October 8, 1992 meeting, and specifically noted that the lease assignment would include a provision that the District "has no ongoing obligation to execute any application for a new or renewed permit after expiration of the initial permit, and . . . specifically reserves the right to decline to do so if it determines that it is not in the District's best interest to execute same." DX 6; Tr. 339-40. The Commissioners wanted additional information prior to making their decision and deferred the issue to a later meeting. Tr. 340-41.

On October 14, 1992, Kincke sent Lowe a letter responding to some of the Board's concerns at the October 8 meeting, which Kincke and other Heritage representatives had attended. DX 8. Kincke indicated that Heritage had learned about the need for the District's signature on the permit application "on the eve of issuance," a statement confirmed by Dr.

Kenneth Price, Heritage's Chairman, at the February 2003 hearing. Tr. 244. Given that Heritage has been in the hazardous waste industry since the 1970s and was operating under an interim status RCRA permit since approximately 1988, the Court does not credit Kincke's written representation or Dr. Price's testimony. Tr. 241-42. In any event, the Board considered the matter again at an October 22, 1992 hearing but deferred it a second time due to lingering concerns and questions. Tr. 346-47. Finally, on November 5, 1992, the Board authorized the District to execute the lease Assignment and the RCRA permit application with the modifications set forth in the General Superintendent's October 22 Board Transmittal Letter recommending this action. Tr. 348-50. That letter reiterated the District's understanding that the lease would contain a provision stating that the District had no ongoing obligation to execute future permits. DX 10.

On November 11, 1992, Dr. Price sent the General Superintendent a letter regarding appropriate permit application language. Dr. Price stated that "the ability of the Board of Commissioners to reject future permits is recognized in the agreement and acceptable to Heritage." However, Heritage wanted to have a right to cancel the lease in the event the Board did in fact reject a future permit application. Dr. Price also asked that the Board be required to act reasonably in deciding whether to execute future permit applications. DX 11; Tr. 352-53. The following day on November 12, 1992, Kincke sent Lowe a letter again requesting a right of cancellation and specifically acknowledging the District's position that it had no continuing obligation to sign future permit applications:

> This understanding of the deal is substantiated by statements in the Staff's October 1, 1992 letter to the Board in which you said:

> [t]he amended lease as it relates to Heritage will also contain a
> provision that provides that the District has no ongoing obligation
> to execute any application for a <u>new</u> or <u>renewed</u> permit <u>after</u>
> expiration of the initial permit . . .

DX 12 (emphasis in original); Tr. 355-56. Lowe explained that the requests for cancellation rights and reasonable action by the Board were not feasible because (1) the Board did not give the District authority to include a cancellation provision in the Assignment, and such a provision is inconsistent with District policy and practice in any event; and (2) the District cannot impose a reasonableness standard on the Board. Tr. 350-53, 357. By letter dated November 23, 1992, Heritage withdrew its request for a right of cancellation and proposed the language now embodied in §10.04 of the Assignment. DX 14; Tr. 359.

This Court finds Lowe's testimony regarding the parties' intent persuasive. It appears to this Court that Heritage was extremely aggressive in seeking the District's signature on the initial permit application but that the company at all times understood that the District did not intend to agree to an ongoing obligation to renew that permit. Indeed, the correspondence from Heritage's own counsel and Chairman supports this conclusion. Contrary to Heritage's assertion, such an understanding does not undermine the other terms in the Assignment. Sections 3.12 and 3.14 indicate that Heritage will conduct waste management activities on the premises, but does not limit such activities to those involving RCRA-permitted hazardous waste. *See* §3.12 ("*to the extent that* any Hazardous Materials are manufactured, brought upon, placed, stored, transferred or distributed upon or within the . . . premises . . . Lessee agrees to conduct such operations in compliance with all Environmental Laws") (emphasis added).

This brings us to the question whether, in light of the parties' intent, the District's legal and technical staff members acted "unreasonably" in withholding a recommendation to execute the RCRA permit renewal application. Heritage argues that the District's concerns about being a co-permittee of a hazardous waste facility were all resolved in 1992 and that it is now unreasonable for the District to "change its mind" about its co-permittee status. As noted, however, the parties specifically contemplated that the District could change its mind if it determined that renewal was not in its best interests, and even though it signed the initial permit in 1992. Thus, the District was not unreasonable merely because it expressed continuing concerns about co-permittee status.

Heritage also argues that the District's decision is unreasonable because Heritage is a strong company with a solid record of compliance with environmental laws and regulations. In addition, Heritage is now seeking to store less hazardous waste than it did under the initial permit, thereby decreasing the risk of serious spills. Tr. 63-64, 73-75, 77-78, 86-88, 242; PX 19, 20. But nothing in the parties' negotiations history or the Assignment itself suggests that the reasonableness of withholding a recommendation for permit renewal is to be measured by Heritage's financial status and safety record over the term of the initial permit. And in that regard, the District notes that Heritage was subject to at least two civil fines which were not promptly and fairly disclosed in response to a specific District request, and that there have been various hazardous waste spills at the Lemont site. DX 32; Tr. 78-80, 91-92, 123, 143-44, 366-68, 425-26.

Moreover, the District presented evidence that it did evaluate and consider Heritage's financial and safety record, among other factors, in reaching its decision. Superintendent Farnan

12

held an initial meeting with his staff to discuss Heritage's permit renewal request and later met with Heritage representatives, including Dr. Price. Superintendent Farnan requested a technical report from the District's new site remediation specialists seeking information on such topics as Heritage's operations, site history/violation status, and financial surety. He then convened another meeting with the District's legal and technical staffs to further evaluate the renewal request. Ultimately, the District concluded that it was not in the best interests of the District or the public to continue as a co-permittee subject to joint and several liability for environmental violations. Tr. 419, 422-41, 452-53; PX 19; DX 19, 19A.

On balance, this Court finds that Heritage has not demonstrated a reasonable likelihood of success on its claim that the District has a contractual obligation to sign the RCRA permit renewal application, or that the staff members acted unreasonably or in bad faith in withholding their recommendation for renewal.

## B. Irreparable Harm/Inadequate Remedy at Law

Having determined that Heritage presented insufficient evidence of a reasonable likelihood of success on the merits of its breach of contract claim, the Court need not address the remaining factors in the preliminary injunction test. *Clemens v. Peters*, 69 F.3d 539 (7th Cir. 1995); *Reebok International, Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1556 (Fed. Cir. 1994). Nevertheless, the Court notes that Heritage has failed to meet its burden of establishing irreparable harm or an inadequate remedy at law.

Irreparable harm is harm that cannot be compensated by money damages. *Graham v. Medical Mutual of Ohio*, 130 F.3d 293, 296 (7th Cir. 1997) ("the injury must be of a particular nature, so that compensation in money cannot atone for it") (internal quotations omitted).

13

Heritage claims that it will suffer irreparable harm without a preliminary injunction because its RCRA permit will expire on April 28, 2003, at which time 70 percent of its operations will have to cease. Tr. 159-60; Pl. Mem., p. 8. Gary Lindgren, Heritage's senior vice president in charge of compliance and fixed facilities, testified that Heritage will have to close down the Lemont facility if it does not obtain the RCRA permit. Tr. 69-70, 160. In addition, Heritage argues that it cannot measure or quantify the loss of goodwill it will suffer if it can no longer perform RCRA-permitted activities at the Lemont facility throughout the term of the lease. Tr. 92-93. And obtaining a new RCRA permit for a new location would likely take years. Pl. Mem., p. 9; Tr. 91.

The Court agrees that the permit loss will negatively impact Heritage's business at the Lemont facility. However, Heritage knew that the District would not agree to an ongoing obligation to renew permit applications but entered into the Assignment in any event. *See, e.g., Ty, Inc.*, 237 F.3d at 903 (party "[h]aving adopted its course ... cannot now complain that having to mend its ways will be too expensive"). In addition, there is some evidence that Heritage could and would continue to operate the Lemont facility in the absence of the RCRA permit. Superintendent Farnan testified that shortly after the District notified Heritage of its decision not to sign the renewal permit, Dr. Price told him that Heritage would continue to perform certain types of operations at the facility. Tr. 442-43. *See also* DX 5, 8 (indicating that even in 1992 Heritage planned to continue operating the Lemont facility if it did not obtain a RCRA permit, notwithstanding improvements made to obtain it). Moreover, Heritage operates 21 facilities throughout the country and may be able to transfer work to one of its seven other RCRA-permitted locations and perform non-permit work in Lemont. Tr. 45; 138-42, 231-33.

14

Heritage argues that "two substantial units of the Facility, which Heritage added as permitted improvements to the property, at significant expense, will become non-operational." Pl. Reply, p. 7. However, it appears that at least one of those facilities – the Aerosol Can Processing Unit – was largely constructed before Heritage even had a RCRA permit or approached the District about signing it. Tr. 52-54, 228-29; Def. Br. Ex. A, p. 3. Heritage also argues that it will be difficult to assess its lost future profits over the remaining 58 years of the lease, but the company's own Chairman could not confirm that Heritage will actually continue to operate the Lemont facility in its present capacity until the year 2060. Tr. 219 (indicating only that as of now Heritage has no intention of ceasing operations). And as noted, Heritage has discretion whether to seek renewal of its RCRA permit every ten years. For purposes of this motion for a mandatory preliminary injunction, Heritage has not met its burden of establishing irreparable harm or an inadequate remedy at law. *See Graham v. Medical Mutual of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997) ("[a] mandatory injunction requires the court to command the defendant to take a particular action, [so] mandatory preliminary writs are ordinarily cautiously viewed and sparingly issued") (internal quotations omitted); *W.A. Mack, Inc. v. General Motors Corp.*, 260 F.2d 886, 890 (7th Cir. 1958) (mandatory injunctions are rarely granted and will only issue "upon the clearest equitable grounds").

## CONCLUSION

For the reasons stated above, Heritage's motion for preliminary injunction should be denied. In addition, Heritage's Motion in Limine to exclude extrinsic evidence (Docket Entry #13-1) and the District's Motion for a Directed Finding (Docket Entry #19-1) should also be denied.

15

Counsel has ten days from the date of service of this Court's Report and Recommendation to file objections with the Honorable Blanche M. Manning. *See* Fed. R. Civ. P. 72(b); 28 U.S.C. §636(b)(1). Failure to object constitutes a waiver of the right to appeal. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327 (7th Cir. 1995).

                                                NAN R. NOLAN
                                                United States Magistrate Judge

Dated: March 4, 2003